## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | | |
|---|---|---|
| **AYESHA GORDON** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **v.** | ) | Civil Action No:_____ |
| | ) | |
| | ) | |
| **VERIZON ONLINE, LLC** | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Ayesha Gordon, by and through counsel, brings this Complaint against Defendant Verizon Online, LLC (hereinafter "Verizon") on the grounds and in the amounts set forth herein:

### Preliminary Statement

1.     This credit reporting account was a travesty from the very beginning and only got worse as time progressed.  Ms. Gordon had leased a new apartment and needed to have internet service installed, so she telephoned the representative of Verizon that the apartment complex told her serviced that property (Will Smith).  The date of installation was October 22, 2022.  That same day Verizon prepared its initial invoice to Ms. Gordon which billed her in advance for the first month of FIOS internet services from October 23, 2022 through November 22, 2022.  Ms. Gordon was unable to connect her computer to the FIOS, so she called Will Smith, called customer service, and when they were unable to help her connect to the internet, she had to cancel the service and find a new internet service provider.  She contacted Mr. Smith again who told her to return the equipment (router), that he would close the account, and that Verizon would credit back the charges since the service never worked.  Ms. Gordon relied upon Mr. Smith to

honor his word and reverse the charges. She returned the equipment on November 15th and waited for the invoice correcting and deleting the charges. Verizon issued a second invoice on November 22, 2022. The second invoice did not include any new charges for FIOS services, but it also did not remove any of the original charges. Ms. Gordon called Verizon multiple times, told it the story, advised it that she had returned the equipment (router) as Mr. Smith had instructed, and that he had assured her that he would correct the billing and remove the charges since the FIOS services did not work. Ms. Gordon continued to reach out to Verizon to resolve this billing issue since she did not think she should owe anything and certainly wasn't going to pay for a full month's worth of service that she never received. On December 14, 2022, Ms. Gordon contacted Verizon again about this billing issue and the customer service representative finally agreed to correct the billing to at least delete the unearned FIOS charges after she cancelled. The agent told Ms. Gordon to wait for the corrected new bill before she paid. The final (corrected) invoice was dated December 22, 2022. That invoice did not include any new charges or late fees, but did show a $34.00 credit for "Adj Fios Monthly Service." Under protest, Ms. Gordon paid the $114.99 Verizon bill in full on January 22, 2022, to protect her excellent (800+) credit and Verizon sent her written notice on the 22nd that the payment had been received. That should have been the end of the issue, but Verizon made matters exponentially worse the following day. Cable and phone companies like Verizon report their accounts as "open accounts" which means that they do not report current accounts to the credit reporting agencies every month and only start reporting the account if it has gone delinquent. On January 23, 2023, after admitting receipt of payment in full, Verizon decided to report the account for the first time to the credit reporting agencies (Experian, TransUnion and Equifax, "CRAs"). Instead of reporting the account as paid in full and closed, it falsely reported the

2

account as so delinquent that it had sent it to collections.  That one change in her credit report data caused her credit score to drop from the 800s to the 600s.  The Credit Reporting Resource Guide provides instruction and guidance to furnishers like Verizon on how to report account data.  It instructs that if an account is not paid by the due date (usually 30 days from the date the invoice was sent), then the account starts to become delinquent.  If the consumer delays 30 days past the due date (i.e. 60 days after the invoice is sent) then the furnisher should report it as 30 days late.  If the account remains delinquent each month thereafter, then it is reported as 60, 90, 120 days late and then as a collection.  The most critical date in all of this is the Date of First Delinquency which is defined as the date that the account first passes 30 days past the due date.  If a bill is paid less than 30 days after the due date (not the initial invoice date) then it should report as a current account.  This account should not even have reported as 30 days late, but Verizon falsely reported it as a debt so bad and delinquent that it was sent to collections.  To further confuse and conceal the grossly false reporting, it reported to the CRAs that the date of first delinquency was October 1, 2022.  Not only was that not the date of first delinquency, but Verizon had not even sent out the first invoice until more than three weeks later on October 22, 2022. Ms. Gordon promptly disputed this erroneous and misleading credit data with Verizon and notified the customer service agent about what Mr. Smith had told her as well as the agent she spoke to in December before Verizon deleted the unearned charges.  Ms. Gordon asked the Verizon representative to look at the records and correct the inaccurate information.  The representative told her that Verizon was not going to correct the credit reporting and the most it would do is report it as a paid in full charge-off.  Unable to convince Verizon to correct this false and misleading credit reporting, Ms. Gordon sent dispute correspondence to all three CRAs who ultimately issued multiple ACDVs to Verizon.  Five different processors processed those

ACDVs on behalf of Verizon. While individually they verified different account data, collectively they all verified that it was such a delinquent and bad debt that it was sent to collections and that the date of first delinquency was accurately reporting as October 1, 2022. The dispute letters and the notices from the CRAs all told Verizon to check the date of first delinquency and all five Verizon processors responded back that October 1, 2022 was accurate and the DFD. This massive drop in her credit score and credit rating based upon a falsely reported collection account caused Ms. Gordon significant damage to her credit rating and significant distress as well. Accordingly, the Plaintiff brings this action for damages based upon Verizon's reckless disregard for its obligations under the Fair Credit Reporting Act, 15 U.S.C. §1681 *et seq.* (hereinafter referred to as the "FCRA). As a result of Verizon's actions, Ms. Gordon seeks actual damages, punitive damages, costs, and attorneys' fees as part of this action.

## Parties

2.      Plaintiff Ayesha Gordon is a natural person. Ms. Gordon is a "person" and "consumer" as defined by the FCRA at 15 U.S.C. §1681a(b) and (c) because she is an individual. Unless otherwise specifically stated herein, the term "Plaintiff" shall refer to Ayesha Gordon.

3.      Verizon Online, LLC (Verizon) is a furnisher of information as contemplated by FCRA section 1681s-2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer. Verizon Online, LLC maintains a principal office address at 22001 Loudon County Pwy, Mail Code C1-3-507, Ashburn, VA, 20147,

## Jurisdiction & Venue

4.      This court has jurisdiction pursuant to the Fair Credit Reporting Act ("FCRA") 15 U.S.C. § 1681(p). Venue is proper in this jurisdiction and division as the Defendant is subject to personal jurisdiction in the Eastern District of Virginia, Alexandria division, by virtue of the

4

business that it conducts in the division as well as the fact that its principal office address is located in the district and division in Ashburn, Virginia. Because the Defendant is subject to personal jurisdiction in the district and division, venue is proper in this Court.

## Factual Allegations

5.      Ms. Gordon moved into a new apartment, and she needed to install new internet services.

6.      Ms. Gordon's building had a relationship with Verizon, who had a sale representative named Will Smith. Ms. Gordon called and texted with Mr. Smith about securing Verizon Fios internet for the apartment.

7.      On September 30, 2022, Mr. Smith asked her for her address and billing information and set up her account. The original installation date was scheduled for October 5, 2022.

8.      Ms. Gordon never met Mr. Smith in person, and they communicated over the phone and through text messages.

9.      Ms. Gordon was unable to accommodate the October 5, 2022, installation date, so she contacted Verizon and changed the date to October 22, 2022.

10.      Ms. Gordon had a trip planned for October 22, 2022. She needed to get internet access, so she agreed to the date and knew that she would need to leave on a trip once the installation had been completed.

11.      The Verizon service technician arrived on October 22, 2022, provided a router and represented that the service had been installed and was working. Ms. Gordon did not have time to verify that the internet services were working before she had to leave for her trip.

12.     That same day (10/22/22) Verizon prepared the initial invoice for service.  It billed her $99.00 for the installation and $49.99 (after a discount) for internet service from October 23, 2022 until November 22, 2022.

13.     At the bottom of that initial invoice, Verizon notified her:

**Late Payment Charge**
To avoid a late payment charge of $9 or 1.5% of your total due, whichever is greater, full payment must be received before Nov 24, 2022.

14.     When Ms. Gordon returned from her trip, she was unable to connect her computer to the internet.

15.     Frustrated by the lack of internet, Ms. Gordon promptly reached out to Mr. Smith to have him assist her in getting the Verizon internet services to actually work.

16.     Mr. Smith advised her to contact customer support at Verizon.  She did that and the technician could not resolve the issue.  Still unable to connect to the internet, Ms. Gordon realized that she would need to find a different service provider that could actually make her internet services work.

17.     Ms. Gordon again reached out to Mr. Smith about what she needed to do to cancel the service.  He advised her that he would cancel the account and credit back the charges, but that she would need to return the router.

18.     Verizon's November 9, 2022 internal file notes record:

Nov 09, 2022 10:10 AM
CX wanted to CXL order **Reason for Contact:** Sales / Acquisition
**Notes**
**Contact Name:** Ayesha Gordon **Agent:** Evans, Tiffany/**evati2a**
Nov 09, 2022 10:10 AM
Initiated 30 day Verizon Return Policy **Reason for Contact:** Billing/Payments
**Notes**
**Contact Name:** cx **Agent:** Maloloy-On, Iris/**malolir**

19.     On November 15, 2022 Ms. Gordon physically returned the router to Verizon and its records confirm that.

20.     On November 15, 2022, Ms. Gordon called Verizon's billing department and spoke with Danita Cadlett.  Ms. Gordon notified Ms. Cadlett about her service that did not work and that Will Smith told her that he would cancel the bill.

21.     Rather than resolve this billing issue or even correct the charge for internet services after she had cancelled and returned the router, Verizon decided to make matters far worse by claiming that it had referred the account to collections.

22.     The initial invoice that issued on October 22, 2022, was not late or past due such that a late payment charge could be included.

23.     Despite the fact that Ms. Gordon had complained about the service not working, communicated with Mr. Smith about cancelling the service, called Verizon to initiate the 30-day return policy and physically returning the equipment (router), Verizon proceeded to send her a second invoice.  Ms. Gordon was unaware that Verizon had decided to claim that this first invoice for service that never worked and was not even 30-days late, had been sent to collections.

24.     On November 22, 2022, Verizon sent Ms. Gordon a new bill. Despite the promises and representations that it would cancel the service and bill, the new bill stated that she still owed $148.99 in past due charges, but there were no new charges added, nor was a late fee added.

25.     Even assuming that Verizon would not refund the $99 installation fee that never worked, she had not had access to the internet to warrant any service charges and most certainly was entitled to a refund or credit for a portion of the services billed in the first month (10/23-

11/22) since she had cancelled the service on November 9 and returned the equipment on November 15.

26.     On December 14, 2022, Verizon's records reflect that Ms. Gordon contacted Joseph Rhee about the erroneous billing.  Ms. Gordon continued to communicate and reach out to Verizon about the erroneous billing. Verizon said that an adjusted invoice would issue to remove the unearned charges for internet service after she had cancelled the service and returned the equipment.  Ms. Gordon was further advised that she should wait for the adjusted bill before paying.

27.     On December 14, 2022, a Verizon representative did adjust the bill to remove the unearned FIOS services after she had cancelled.

28.     Verizon sent Ms. Gordon a text message on December 14:

**TEXT MESSAGE 12/14/22**
**Resend To**
*******865
**From Address:** 27589
**Sent Date:** 2022-12-14 15:01:09.0
Hi it's Verizon, we have issued a credit for $34.00 to your account ending in 079-0001. This credit will appear in 1-2 billing cycles.

29.     On December 22, 2022, Verizon sent her an adjusted and corrected bill of $114.99, which reflected the $34.00 credit back for the services that had been pre-billed in advance, but never provided.

30.     Despite the fact that she disputed owing Verizon anything for installation of service that never worked, on January 22, 2023, Ms. Gordon paid the $114.00 that Verizon billed for the account.

31.     On January 22, 2023, Verizon sent Ms. Gordon a written notification acknowledging that it had received the full and final payment of $114.99.

32.     On January 23, 2023 (the day after it had received payment in full on this disputed account) Verizon reported to the big three CRAs (Experian, TransUnion and Equifax) that this account was such a bad debt that it had written it off as bad debt and sent it to a collection agency.  Despite the fact that its internal file notes reflected the issues with the initial installation and activation service, her communications with Verizon including multiple phone calls to address this billing issue, the subsequent correction of the initial/final invoice to delete the charges for FIOS service that was never provided, and the fact that she had paid the corrected final bill in full, Verizon still decided to damage her credit by falsely reporting to the CRAs that this was a bad and uncollectible debt that had to be sent to collections.

33.     In its IFINALS notes dated January 26, 2023 (4 days after she paid the final bill), Verizon noted that Ms. Gordon had called in and recorded the following:  "CI THAT SHE DIDN'T HAVE THE SERVICE AND THAT THEY WERE SUPPOSE TO CANACLE THE ACCOUNT AND THAT SHE WOUDLN'T OWE IT WOULD BE ADJUSTED BUT DIDNT' AND THAT WHEN THEY FINALLY DID TOLD HER SHE SITLL HAD TO PAY BECAUSE THE TECH DID COME OUT. I ADVISED THAT BALACNE FINAL BILL WAS FINAL BILL 11/22/22 148.99 CREDITED 12/14/22 34 DOLLARS AND HAD REMAINING BALANCE OF 114.99 **PIF ON 1/22/23** ACCOUTN WILL UPDATE IN 30-60 DAYAS TO PAID COLLECT. BIT WOULD NOT BE RMOVED AYESHA SAID THAT WHY WOULD SHE PAY FOR SOMEHTING SHE DIDN'T USE AND i DID LET HER KNWO SHE COULD DISPUTE THE CHARGE WITH BILL BUT THE ACCOUNT WILL REMAIN AS PAID COLLECT." (emphasis added).

34.     Prior to the processing of any of the ACDVs that were issued to and processed on behalf of Verizon, Verizon had recorded in its own documents and records that Ms. Gordon called in and notified Verizon that she had been told that the invoice would be corrected since the service never worked and that she tendered the full payment after correction on January 22, 2023.  Verizon's own documents and records made crystal clear that Ms. Gordon was not

ignoring this issue, that she had called multiple times, that she had been disputing an obligation to pay for a service that never worked, that she had been told that the bill would be corrected and deleted, and that Verizon had to correct the original bill since it could not bill her for services after the account had been closed and the equipment returned.

35.    Any dispute or ACDV processor that was handling any of these disputes coming in from Ms. Gordon had an obligation to review and consider the records in the possession of Verizon.  Any reasonable investigation would see all of the billing and servicing issues, that a final/corrected bill was not sent until December 22, 2022, and that Ms. Gordon made payment on January 22, 2023, which was 30 days after the adjusted and corrected invoice.  It was simply a reckless ACDV response to say that this had become such a bad and past due bill that Verizon could not collect it that it had to be sent out to a collection agency.  Had any of these processors actually taken the time to examine Verizon's own file notes and records, they would have seen not only that the date of account opening was wrong, the DFD was wrong, and that she had paid it in full the day before Verizon reported it as in collections, but that this was all over installation and service that proved ineffective and unusable.

36.    Since Verizon steadfastly refused to correct this misleading and inaccurate credit reporting, on or about February 3, 2023, Ms. Gordon sent a credit dispute letter to the three major credit reporting agencies disputing the Verizon account at issue in this action.

37.    Verizon received a copy of this credit dispute letter because each of the credit reporting agencies attached a copy of the credit dispute letter to the ACDV that Verizon received.

38.    Ms. Gordon's dispute letter detailed the account initiation and problems with services by describing: 1) the service technician and her left the apartment at the conclusion of

the service installation attempt because she was leaving for a trip; 2) when she arrived back, the Verizon services did not work; 3) she called Verizon customer service who never resolved her problem or provided a functioning service; 4) She sent an email to the representative, Will Smith, cancelling the service as of November 6, 2022 and assuring her that she would not have to pay for the service; 5) after Ms. Gordon received bills, Mr. Smith stated that he would cancel the charges on the bill for her, but he never canceled the service; 6) on December 14, 2022, a Verizon phone representative cancelled the service as of November 3, 2022 and stated that an adjusted bill would be sent to her; 7) on December 22, 2022, Verizon finally provided her with a final bill of $114.99, which she paid on January 22, 2023.

39.   Even if these ACDV processors failed to look through the account records and file notes, Ms. Gordon's dispute letter clearly laid out the facts and account history.

40.   On February 20, 2023, Experian issued an ACDV to Verizon that it received along with an image attachment, which was the credit dispute letter dated February 3, 2023.

41.   On February 22, 2023, Verizon's agent Amanda Terry responded to the Experian ACDV.   Experian's ACDV had instructed Verizon to investigate as a 106 code meaning "Disputes present/previous Account Status History. Verify accordingly."   When Ms. Terry responded to the ACDV, she stated that the open date was September 30, 2022, which was not correct.   Ms. Terry further misrepresented the date of first delinquency as October 1, 2022.   The date of first delinquency is the date that an account goes 30 or more days past due and is never paid or brought current.   Obviously, an account that is opened one day cannot go 30 days or more past due by the following day.

42.     The dates reported by Ms. Terry were grossly inaccurate.  While Ms. Gordon may have called on September 30 to schedule service installation, Verizon had done nothing to install or provide service until the date of installation on October 22, 2022.

43.     The very first invoice on this account was dated October 22, 2022, and was not prepared until Verizon had actually installed the service.  Verizon notifies customers that they have thirty days to pay a new invoice and the bill itself made clear that a late payment penalty would not be assessed until November 24, 2022.  The reporting of the date of first delinquency (DFD) on this account as October 1, 2022, was intentionally false and reckless.

44.     The fact that the DFD was only one day after the alleged date of account opening was a red flag to any ACDV processor that those two dates together could not possibly be correct.  Moreover, the fact that the DFD was being reported and verified as three weeks before the date of the first invoice, these processors had to know that they were wrong on their face.  The ACDV was also incorrect in that it stated the date of last payment was January 23, 2023 when in fact Ms. Gordon paid the day before on January 22, 2023.  This one day difference was critical because Verizon's records indicate that the first credit reporting of the past due collections was not scheduled until the day after she had paid: January 23, 2023.

45.     The Consumer Data Industry Association produces the Credit Reporting Resource Guide to help furnishers like Verizon understand how to report credit file data.  The following excerpt walks them through how to report an account that has lapsed into delinquency.  As is clear from this chart, only after the account is 119+ days past due should it be reported in collections and it also explains clearly how to calculate the DFD.

## Explanation and Examples of FCRA Compliance/
## Date of First Delinquency (Field 25)

**Example 1:** Displays an account that goes delinquent to current and then goes delinquent again.

| Date of Account Information (Field 24) | Due Date (Not reported) | Number of Days Past Due Date (Not reported) | Account Status & Definition (Field 17A) | Date of First Delinquency (Field 25) |
|---|---|---|---|---|
| 03/12/2020 | 03/20/2020 | 0 | 11 Current Account 0-29 days past the due date | Zero fill |
| 04/12/2020 | 03/20/2020 | 23 | 11 Current Account 0-29 days past the due date | Zero fill |
| 05/12/2020 | 03/20/2020 | 53 | 71 30-59 days past the due date | 04/19/2020 (First Delinquency) |
| 06/12/2020 | 03/20/2020 | 84 | 78 60-89 days past the due date | 04/19/2020 |
| 07/12/2020 | 06/20/2020 | 22 | 11 Current Account 0-29 days past the due date | Zero fill |
| 08/12/2020 | 06/20/2020 | 53 | 71 30-59 days past the due date | 07/20/2020 (First Delinquency) |
| 09/12/2020 | 06/20/2020 | 84 | 78 60-89 days past the due date | 07/20/2020 |
| 10/12/2020 | 06/20/2020 | 114 | 80 90-119 days past the due date | 07/20/2020 |
| 11/12/2020 | 06/20/2020 | 145 | 93 (Collection) | 07/20/2020 |

**Note: The Date of First Delinquency is used by the consumer reporting agencies for purging purposes.**

(continued)

46. On February 23, 2023, Tiffany Myers responded on behalf of Verizon to an ACDV that Equifax issued after Equifax received the February 3, 2023, credit dispute letter. Equifax had instructed Verizon to investigate the present and previous account status and payment rating/ account history and to verify the account status, payment rating, and account history. The ACDV response from Ms. Myers verified as accurate that the date of first delinquency for the account was October 1, 2022, with a last payment date of January 1, 2023, and the account closed as of November 1, 2022. None of this information was correct in the ACDV response. Given that the credit dispute letter and Verizon's internal records contained reams of information that contradicted this ACDV response, only a negligent and or reckless reinvestigation would have resulted in this ACDV response.

47. On February 24, 2023, Tiffany Myers on behalf of Verizon responded to the ACDV that Trans Union issued after receiving the credit dispute letter dated February 3, 2023. As with the other ACDV responses, the Trans Union ACDV response included demonstrably

inaccurate information including that the account was opened September 30, 2022, and became 30 days past due the following day on October 1, 2022, which was more than three weeks before any services were provided and any invoice was prepared. In addition, Verizon continued to report that this was a paid collection which it delayed reporting to the CRAs until the day after she had paid the bill.

48.    As with the other responses, an ACDV processor would have had to ignore not only the information in credit dispute letter attached to the ACDV but also the internal documents and records available within Verizon. Verizon certified back to Trans Union that: "By submitting this ACDV, the Company certifies that it has reviewed and considered all associated Images and relevant information, verified the completeness and accuracy of the information in compliance with all legal requirements, and adjusted Company records to reflect the data submitted." That certification like all the others before and after it, was false and recklessly so since Verizon knew from its own records what had transpired and most certainly knew that the DFD could not be verified as occurring three weeks before Verizon provided installation and even issued the first invoice.

49.    On March 8, 2023, Tiffany Myers responded to a second ACDV issued by Equifax to Verizon, and she provided the same reckless and misleading response that she had previously provided on February 24, 2023, as discussed in the preceding paragraph.

50.    Based upon information and belief, Verizon hires a third-party contractor to conduct its ACDV reinvestigations named GC Services. GC Services is believed to employ the individuals identified on the ACDV responses, and these processors have limited Verizon documentation available for review and limited authority to make changes to credit reporting as they conduct a simple data conformity review. In prior depositions, GC Services employees

explained that Verizon does not give them the authority to correct or modify data unless it is contradictory to what Verizon is currently reporting. Thus, if the accuracy of what Verizon is reporting is disputed or challenged, GC Services (in the past at least) testified that they have not been authorized to correct or modify it.

51.     Verizon is on notice from other credit reporting cases that data conformity reviews that do not reasonably reinvestigate ACDVs may support the imposition of significant punitive damages for violations of the Fair Credit Reporting Act.

52.     On April 13, 2023, Ms. Gordon sent a second credit dispute letter to the three major credit reporting agencies, who received the letter and issued ACDVs to Verizon.

53.     Ms. Gordon's April 13, 2023, credit dispute letter once again asked for the deletion of the paid collection based in part on the fact that Verizon never provided working services or an accurate bill until December 22, 2022. The letter noted that the investigator(s) should check the account records, which would and in fact did prove that Verizon never provided a working account or an accurate bill to pay until December 22, 2022. She also noted that while the account was not an outright fraud, Verizon had told her that it would close the account with no charges. However, Verizon would not honor that promise, and instead it finally agreed to correct and credit back the service charges that were billed, but never provided after she cancelled and returned the equipment.

54.     On May 11, 2022, 2022 Jaime Berdugo responded on behalf of Verizon to an ACDV that Experian issued after receiving the April 13, 2023 credit dispute letter. Just like the other processors before him, Jaime Berdugo stated that the account was opened on September 30, 2022 and the date of first delinquent was the following day on October 1, 2022. This response is patently inaccurate based upon the information that Verizon maintained in its records

because services were not installed until October 22, 2022, and the first invoice only issued on that date. In addition, the ACDV response stated that the date of last payment was January 23, 2022 when Ms. Gordon had paid on January 22, 2022 and Verizon confirmed that back to her by text message. This one day was a critical distinction because Verizon's internal records state that the account would not be credit reported as a collection until January 23, 2023. Jaime Berdugo should have seen that the payment was made on January 22, 2022, and that Verizon never should have reported the account as having been sent to collections after the full and final payment had been tendered and received. Only a negligent and reckless ACDV investigation would have ignored the information provided in Ms. Gordon's letter and the information available in the Verizon records.

55.     On May 11, 2022, Jaime Berdugo on behalf of Verizon also responded to an ACDV issued by Equifax after it received the April 13, 2023 credit dispute letter. This ACDV response also included patently incorrect information because it stated that the account opened September 2022 was first delinquent October 1, 2022 with a date of last payment as January 1, 2023. As previously discussed, this response was patently incorrect when viewed in comparison to information maintained in Verizon records and information provided by Ms. Gordon that was included as part of the credit dispute package. Only a negligent and reckless ACDV investigation would have ignored the information provided in Ms. Gordon's letter and the information available in the Verizon records.

56.     On May 12, 2023, Tiffany Myers on behalf of Verizon responded to an ACDV that Trans Union issued after receiving the April 13, 2023 credit dispute letter. Trans Union's ACDV included a consumer message that stated, "Verizon should have never opened the account I never received va (sic) working account that I told Verizon service never worked right way the

16

account related to unearned fees that Verizon asked me to pay."  Tiffany Meyers necessarily ignored this additional information, ignored the information in the credit dispute letter that TransUnion attached to the ACDV, and ignored the information available in Verizon's internal records by reporting patently incorrect information on the ACDV response. She reported on the ACDV that was a paid collection with the account opened on September 30, 2022 and first delinquent on October 1, 2022.  The ACDV response also stated that the $114 payment was made on January 23, 2023 when in fact it was paid on January 22, 2023 after the final bill with all the admitted credits that totaled $114.99 was issued on December 22, 2022.  The reality is that Ms. Gordon was not even 30 days late on payment for services that never worked and should not have been charged off in the first place.  Only a negligent and/or reckless investigation would have ignored the totality of the information available and reported the information that Tiffany Myers put on the ACDV.

57.  On June 21, 2023, Ms. Gordon tried for a third time to have the Verizon account removed from her credit file by sending a three page descriptive credit dispute letter that completely outlined the time line of events and included over 15 pages of Verizon communications and invoices to the three major credit reporting agencies.

58.  This dispute letter was very descriptive about the irrefutable facts related to the start of services and charges not incurring until October 22, 2022 and that Verizon never provided working services:

Your data shows that the account was opened on September 30, 2022 and thereafter immediately went into default. It is important that you investigate and understand the timeline. I was moving from New York to Washington for work and located this apartment. The manager said that they were using Verizon for internet at the building, so I called in the end of September to schedule an install and hookup later in October after I moved into the apartment. The initial install date was supposed to be October 5, 2022, but I was traveling then so I called and rescheduled it for October 22. The plan was to get the installation and then I had to leave the area again that afternoon and when I returned, I would have internet. I literally walked out with the Verizon technician and did not have time to check the service to see if my computer would connect to the internet. When I returned, I discovered that the internet was not connecting or working so I called my Verizon contact (Will Smith) to notify him that it was not working. He told me to call customer support, which I did, but they were unable to resolve the problem. I contacted Mr. Smith to notify him that the internet was not working, that I needed to have a working internet and that if Verizon could not make the service work that I would need to go with another provider.

Verizon sent the first invoice dated October 22, 2022 for the first month's service and the $99 installation fee. That invoice shows that the date of installation was October 22 and that the initial charge for internet services began on October 23 and went through November 22. I spoke to Will Smith who told me that he would cancel the service and that they would credit back the fees and that I would not need to pay for anything since Verizon could never make the internet work for my place.

59.     The dispute letter was also very descriptive about why the account should have never been reported as in collections because Verizon never even assessed a late fee and Ms. Gordon paid on the $114.99 on January 22, 2022 that Verizon had only invoiced on December 22, 2022:

The next invoice was dated December 22, 2022. It showed a credit of $34.00 on December 14, 2022, and a new reduced balance of $114.99. There were no additional fees or late charges because the bill was not late, and they were still correcting it and applying credits for service that Verizon knew I never received. I disputed that I owed anything for service that was never activated or used, but to be on the safe side and protect my credit rating and score I went ahead and paid the reduced bill of $114.99 on January 22, 2023, which was 30 days after Verizon sent me the updated and final bill.

60.     Verizon received two ACDVs with this June 21, 2023 credit dispute letter, text communications, and invoices attached to the ACDV from Equifax and Trans Union.

61.     On July 15, 2023, Christopher Wilson on behalf of Verizon responded to the ACDV issued by Equifax after it received the June 13, 2023 credit dispute package. Equifax had attached the credit dispute package and instructed Verizon to investigate account status/payment rating, history and "verify the date of first delinquency." However, Christopher Wilson responded with another patently inaccurate response by stating that the account was first delinquent in October 1, 2022, which was demonstrably untrue and had to ignore the information provided with the credit dispute package and the information available in Verizon's records. The response also included inaccurate information related to the date of last payment because it stated January 1, 2023 and the current type and rate of the account as an "O6."

62.     On July 14, 2023, Reginae Smith responded on behalf of Verizon to an ACDV that Trans Union issued on July 4, 2023 after receiving the June 13, 2023 credit dispute package. Trans Union also attached an image containing a copy of the credit dispute letter and the supporting documentation to the ACDV. Just as occurred with all the previous responses, Reginae Smith reported an inaccurate date of account opening of September 30, 2022, inaccurate date of first delinquency of October 1, 2022, inaccurate date of last payment January 23, 2023, and ignored the specific instructions of Trans Union to investigate the date of first delinquency. Only a negligent and/or reckless reinvestigation would have resulted in this ACDV response.

63.     Verizon's responses demonstrate that it does not meaningfully investigate any dispute no matter how much information that the consumer provides as part of the dispute process. Verizon simply conducts a data conformity review which assures inherently inaccurate information already reported to a credit reporting agency remains on a consumer's credit file.

64.     By continually misrepresenting the DFD as October 1, 2022, Verizon made the account look like it had been in default for months. Verizon knew and its records all confirmed

that the first invoice for charges and service did not issue until three weeks later on October 22, 2022. Had Verizon and its outsourced dispute processors corrected and updated the true DFD, the CRAs would have been placed on notice that what Ms. Gordon was saying in her dispute letters was accurate and that what Verizon was reporting was clearly inaccurate. By falsely backdating the DFD to weeks before even the first invoice issued, it made the account appear to have been so late that collections may have been warranted.

**COUNT I**
**Fair Credit Reporting Act**
**15 U.S.C. §1681 s-2(b)**

65.     Plaintiff incorporates paragraphs one (1) through sixty-four (64) as if fully stated herein.

66.     Verizon violated both 15 U.S.C. §1681n and §1681o when it violated the Fair Credit Reporting Act at 15 U.S.C. §1681s-2(b) by negligently and/or recklessly failing to conduct a reasonable investigation with respect to the disputes that it received related to the Verizon account from the credit reporting agencies.

67.     Pursuant to 15 U.S.C. §1681s-2(b), a furnisher has mandatory investigation requirements after it receives an ACDV from a consumer reporting agency. After receiving the ACDV a furnisher must:

(A) conduct an investigation with respect to the disputed information;

(B) review all relevant information provided by the consumer reporting agency;

(C) report the results of the investigation to the consumer reporting agency;

(D) if the investigation finds that the information is incomplete or inaccurate, report the results to all other credit reporting agencies to which the person furnished the information; and

(E) If an item of information disputed by a consumer is found to be inaccurate or incomplete, or cannot be verified after any reinvestigation required pursuant to the statute, modify, delete, or permanently block the reporting of that information.

*See* 15 U.S.C. § 1681s-2(b)(1).

68.     The FCRA authorizes punitive damages for willful violations of the statutory duties identified in the statute.  The clear instruction and long-standing precedent of cases analyzing 15 U.S.C. §1681s-2(b) hold that a reasonable furnisher investigation under the FCRA requires a systemic inquiry and not just a cursory examination of computer records as occurred in all of the "investigations" in this case.  *See Johnson v. MBNA, Inc.* 357 F.3d 426, 430-431 (4th Cir. 2004) *stating* "Thus, the plain meaning of 'investigation' clearly requires some degree of careful inquiry by creditors. Further, § 1681s-2(b)(1)(A) uses the term 'investigation' in the context of articulating a creditor's duties in the consumer dispute process outlined by the FCRA. It would make little sense to conclude that, in creating a system intended to give consumers a means to dispute - and, ultimately, correct - inaccurate information on their credit reports, Congress used the term 'investigation' to include superficial, *unreasonable* inquiries by creditors."

69.     Courts have held that reasonable investigations may require more than just a review of internal documentation.  This is especially true when among the allegations is that the documents relating to the underlying transaction are flawed.  "A jury could therefore find it was unreasonable for Chase to not expand its investigation beyond its own internal records."  *See Petras v. Navy Federal Credit Union*, 2:20-cv-00874, United States District Court of Nevada, Document 98, page 10 of 13 filed 2/22/22

70.     As detailed in the factual allegations, Verizon responded to multiple ACDVs issued by the credit reporting agencies and continued to report the account as a paid collection account despite the fact Verizon delayed in providing a final bill, Ms. Gordon paid within 30 days of receiving a final bill that did not include any late charges.  As part of the ACDV responses, Verizon misrepresented the date of account opening, misrepresented the date of first delinquency, and misstated the actual payment date so that Verizon could fit the false narrative that this account was a paid collection.  Verizon's actions were reckless given the information and account statements that existed related to the history between it and Ms. Gordon.

71.     Based upon previous cases involving Verizon, this fact pattern is another example of the reckless manner in which Verizon conducts consumer credit dispute investigations. Verizon has a pattern and practice of outsourcing these investigations to third parties, typically GC Services, who in turn responds to the ACDVs on behalf of Verizon.  This third-party lacks the same access to information in Verizon records as Verizon itself maintains such that the third-party furnisher does not conduct a true investigation of the dispute as contemplated by the FCRA.  Instead, Verizon has simply implemented a system for speed and low cost that assures disputed data only mirrors the inaccurate information that Verizon reported in the first instance.

72.     Based upon information and belief and prior cases involving Verizon and GC Services, Verizon neither trusts nor empowers GC Services employee to conduct the required reinvestigation pursuant to §1681s-2(b).  This fact is further supported by the fact that all five ACDV processors (Terry, Myers, Berdugo, Wilson & Smith) could clearly see that the DFD could not possibly be October 1, 2022, yet not one of them corrected that information.  Even after Ms. Gordon's dispute letters pointed it out and the CRAs instructed them to check and verify the DFD, these five processors all collectively verified the DFD as accurate and certified

back to the CRAs that they had: "reviewed and considered all associated Images and relevant information, verified the completeness and accuracy of the information in compliance with all legal requirements, and adjusted Company records to reflect the data submitted." These false representations and certifications were intentional, reckless, and just the way that Verizon wanted them to act.

73.     Had Verizon conducted the reasonable and necessary investigations mandated by the FCRA, it would have discovered that the account was not opened on September 30, 2022 as the services were not attempted to be installed until October 22, 2022; that the invoices provided in October and November 2022 were inaccurate, the final invoice was provided on December 22, 2022; no late payment fees had been added to any of the invoices, and Verizon's records indicated that Ms. Gordon paid the invoice on January 22, 2023. Only a reckless investigation procedure would allow Verizon to continue to verify to the credit reporting agencies that provided inaccurate and misleading information related to the date of account opening, date of first delinquency, and date of payment for the account.

74.     Plaintiff is entitled to actual damages, statutory damages, and punitive damages based upon the violations of the Fair Credit Reporting Act. Plaintiff suffered damages in the form of loss of time working to correct the reporting of the inaccurate account, increased costs of credit, avoidance of using credit, and the emotional distress of continuing to deal with problems related to account as well as all attorney's fees and costs.

**Prayer for Relief**

Wherefore, the Plaintiff prays that the Court award the following relief:

a)      Compensatory damages against Defendant;

b)      Punitive damages based upon Defendant violations of the FCRA;

c)      Statutory damages against Defendant based upon their violations of the FCRA;

d)      Pre-judgment interest, interest, costs and reasonable attorneys' fees incurred by

the Plaintiff;

e)      All other further relief that this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand trial by jury as to all issues against all defendants.

Respectfully submitted
AYESHA GORDON

By: Counsel

A. Hugo Blankingship, III, VSB 26424
Blankingship & Christiano, P.C.
11862 Sunrise Valley Dr., Suite 201
Reston, Virginia 20191
(571) 313-0412
F:(571)313-0582